UNION PACIFIC RAILWAY COMPANY v. G. H. D. JOHNSON ET AL.

FILED MAY 2, 1895.    No. 6141.

1. **Carriers:** BILLS OF LADING: INDORSEMENT: EFFECT. Bills of lading are symbols of property, and when properly indorsed operate as a delivery of the property itself, investing the indorsees

with a constructive custody which serves all the purposes of an
actual possession, and so continues until there is a valid and
complete delivery of the property, under and in pursuance of
the bill of lading, to the person entitled to receive the same.
*Pennsylvania R. Co. v. Stern*, 119 Pa. St., 24, and *Gates v. Chicago,
B. & Q. R. Co.*, 42 Neb., 379, followed.

2. ———: ———: DELIVERY OF GOODS. The delivery of goods by
a common carrier to the consignee thereof is made at the peril of
the carrier, unless when made the consignee surrenders the bill
of lading either made or indorsed to himself. *Gates v. Chicago,
B. & Q. R. Co.*, 42 Neb., 379, followed.

3. ———: ———: ———: LIABILITY OF CARRIERS: TORTS. A rail-
way company issued to shippers of grain in Nebraska several
bills of lading as follows: "Received of ——— [the name of the
shipper] the following described freight  *  *  *  marked and
consigned as noted below  *  *  *  to be transported to ———,
and delivered at the railway depot on payment of freight charges
together with such charges as have been advanced on the same.
Consignee, Brown Bros. Grain Company. Destination, Milwau-
kee, Wis." The bills of lading contained the following nota-
tions: "Care Union Elevator, Council Bluffs, Iowa. Stop at
Brown Bros. Elevator Company to clean. Transfer at Council
Bluffs." The carrier transported the grain to Council Bluffs
and there delivered it to the consignee named in the bills of
lading without requiring their presentation or surrender. The
consignee sold the grain to Bacon & Co., of Milwaukee, and drew
on them for its value, with the bills of lading indorsed to them
attached to the drafts. Bacon & Co. honored the drafts, pre-
sented the bills of lading to the carrier and demanded the grain,
and as it was not delivered, sued the carrier for its value. Part
of the grain was delivered by the carrier to the consignee named
in the bills of lading before he indorsed and attached them to
the drafts drawn on Bacon & Co. *Held*, (1) That the bills of
lading were through contracts, under and by which the carrier
agreed to transport the grain from the places where it received
it to Milwaukee, and there deliver it to the party entitled
thereto; (2) that the notations on the bills of lading meant
nothing more than that the grain should go by way of Council
Bluffs to be cleaned there, or transferred to other carriers through
the instrumentality of the elevator located there; (3) that the
carrier, by the bills of lading, contracted to transport this grain
to Milwaukee, and there deliver it to the consignee named in
the bills of lading, or, if they had been transferred, to the lawful
holders of said bills of lading; (4) that Bacon & Co., by honor-

ing the drafts drawn against them by the consignee named in the bills of lading, became and were entitled to have said grain delivered to them at Milwaukee; (5) that the carrier, by delivering the grain to the consignee at a station intermediate the point of shipment and the point of destination and without the surrender of the bills of lading, was guilty of a misdelivery and conversion of said grain; (6) that so long as the bills of lading were outstanding they were representations by the carrier to the commercial world that it had in its possession and under its control and in transit to Milwaukee the grain for which the bills of lading called; (7) that the carrier by delivering the grain while in transit to the consignee named in the bills of lading without their surrender put it in the power of Brown Bros. Grain Company to defraud third parties by selling the grain and indorsing the bills of lading, and that the carrier was also liable for the grain, on the principle that where one of two innocent parties must suffer, he who by his conduct has enabled a wrong-doer to perpetrate a wrong must bear the loss rather than the party without fault.

ERROR from the district court of Douglas county. Tried below before KEYSOR, J.

*John M. Thurston* and *W. R. Kelly*, for plaintiff in error, cited: *Pullman Palace Car Co. v. Missouri P. R. Co.*, 115 U. S., 587.

*John D. Howe* and *E. R. Duffie*, contra, cited: Hutchinson, Carriers, secs. 130, 344; *Furman v. Union P. R. Co.*, 106 N. Y., 579; *Colgate v. Pennsylvania R. Co.*, 102 N. Y., 120; *Missouri P. R. Co. v. Young*, 25 Neb., 651; *Ladue v. Griffith*, 25 N. Y., 364; *St. Louis, K. C. & N. R. Co. v. Piper*, 13 Kan., 505; *Mercantile Mutual Ins. Co. v. Chase*, 1 E. D. Smith [N. Y.], 115; *Home Ins. Co. v. Western T. Co.*, 51 N. Y., 93; *Bulkley v. Naumkeag Steam Cotton Co.*, 24 How. [U. S.], 386; *Claflin v. Boston & L. R. Co.*, 7 Allen [Mass.], 341; *Devereaux v. Barclay*, 2 B. & Ald. [Eng.], 704; *Forbes v. Boston & L. R. Co.*, 133 Mass., 154; *Weyand v. Atchison, T. & S. F. R. Co.*, 75 Ia., 580.

RAGAN, C.

In the months of October and November, 1891, certain persons at certain points in the state of Nebraska delivered to the Union Pacific Railway Company (hereinafter called the "Railway Company") for transportation seven cars of grain. The Railway Company at the time of such delivery issued and delivered to said shippers bills of lading for the grain received by it. All said bills of lading were substantially as follows: "Received of ——— [the name of the shipper] the following described freight * *· * marked and consigned as noted below * * * to be transported to ———, and delivered at the railway depot on payment of freight charges, together with such charges as have been advanced on the same." Such bills of lading also contained the following directions and notations:

No. 1. "Consignee, Brown Bros. Grain Co. Destination, St. Louis, Mo." (Notation:) "Care Union Elevator, Council Bluffs, Iowa."

No. 2. "Consignee, Brown Bros. Grain Co. Destination, St. Louis, Mo." (Notation:) "Care Union Elevator Co., Council Bluffs."

No. 3. "Consignee, Order Brown Bros. Grain Co. Destination, Milwaukee, Wis." (Notation:) "Stop at Council Bluffs, Brown Bros. Elevator Co., to clean. Transfer at Council Bluffs."

No. 4. "Consignee, Order Brown Bros. Grain Co. Destination, Milwaukee, Wis." (Notation:) "Clean at Council Bluffs, Brown Bros. Elevator Co. Transfer at Council Bluffs."

No. 5. "Consignee, Order Brown Bros. Grain Co. Destination, St. Louis." (Notation:) "Care Union Elevator, Council Bluffs, Iowa."

No. 6. "Consignee, Order Brown Bros. Grain Co. Destination, St. Louis." (Notation:) "Care Union Elevator, Council Bluffs."

No. 7. "Consignee, Brown Bros. Destination, Milwaukee." (Notation:) " Care Union Elevator, Council Bluffs."

The grain consisted of oats, barley, and shelled corn. The parties designated as consignee on the bills of lading are sometimes denominated "Brown Bros." and sometimes "Brown Bros. Grain Co.," but Brown Bros. Grain Company was the party intended as the consignee on each bill of lading. The notation, "Union Elevator" and "Brown Bros. Elevator, Council Bluffs" had reference to an elevator located in that city at that time leased and operated by Brown Bros. Grain Company, the consignee of the grain. It appears from the evidence in the bill of exceptions that at the time these shipments were made there was an elevator located in the city of Council Bluffs, Iowa. This elevator was owned by a corporation known as the Union Elevator Company. A contract existed between the elevator company and some five or six railway companies whose roads entered Council Bluffs, that the elevator company, in handling grain which might come into its possession for cleaning or transfer, or both, would not discriminate either in favor of or against either one of the railway companies mentioned. The Union Pacific Railway Company was a party to this agreement. It further appears that Brown Bros. Grain Company, at the time of the shipments in controversy, was the lessee of this elevator, was in possession of it and operating it. Persons shipping grain from points in Nebraska over the Union Pacific Railway Company's road, and which grain was consigned to Milwaukee or St. Louis, or other eastern points, if they desired, could have said grain stopped at Council Bluffs and cleaned in this elevator; and if it was desired by the Railway Company that the car in which such shipment was made should not go further than Council Bluffs, then the grain would be transferred through this elevator to the cars of the road which was to haul it from there to its place of destination. The Railway Company did not deliver this grain or any

of it either at Milwaukee or St. Louis, but it transported the grain to Council Bluffs, and there made an unconditional delivery of it to Brown Bros. Grain Company, the party named as the consignee in each of the bills of lading, and made such delivery to such consignee without the consignee's surrendering to the carrier the bills of lading issued by it to the shipper. Brown Bros. Grain Company, it appears, sold this grain to E. P. Bacon & Co.; made drafts on them for the value of the grain, and attached to such drafts the bills of lading, each bill of lading being indorsed, "Deliver to the order of E. P. Bacon & Co. Brown Bros. Grain Company. By C. T. Brown, Pt." Bacon & Co., on presentation of the drafts, honored them, and then presented the bills of lading to the Railway Company and demanded the grain. In the meantime Brown Bros. Grain Company had failed, and neither they nor the Railway Company ever delivered the grain to Bacon & Co. At the time Brown Bros. Grain Company indorsed the bills of lading to Bacon & Co., and attached them to the drafts which they drew on them for the value of the grain, the greater part of the grain had already been delivered to them, only one car of the grain being in transit or undelivered to Brown Bros. Grain Company at the time they indorsed said bills of lading and drew said drafts. Bacon & Co. brought this suit against the Railway Company in the district court of Douglas county for the value of said grain. A jury was waived and the case was tried to the court, resulting in a finding and judgment in favor of Bacon & Co.; and to reverse this judgment the Railway Company has prosecuted to this court a petition in error.

1. The bills of lading issued by the Railway Company to the shippers of this grain were through contracts, under and by which the Railway Company agreed to transport this grain from the places where it received it to Milwaukee and St. Louis, and there deliver it to the party entitled thereto. The terms of the bills of lading fixing the ex-

press destination of this grain and the notations, when explained by the evidence, leave no room for doubt whatever that these bills of lading were through contracts. (*Angle v. Mississippi & M. R. R. Co.*, 9 Ia., 487; *Mulligan v. Illinois C. R. Co.*, 36 Ia., 181; *Ogdensburg & L. C. R. Co. v. Pratt*, 22 Wall. [U. S.], 123; *Beard v. St. Louis, A. & T. H. R. Co.*, 44 N. W. Rep. [Ia.], 803.)   The notations on the bills of lading, "Care of the Union Elevator, Council Bluffs," "Stop at Council Bluffs to clean," "Transfer at Council Bluffs," meant and mean nothing more than that the grain should go by way of Council Bluffs; some of it should be cleaned there; and some of it should be transferred to other lines or into other cars at that place through the instrumentality of said elevator.   Doubtless it was a contract on the part of the Railway Company that it would transport said grain to its place of destination by way of Council Bluffs; that it would stop some of the grain at the elevator for the purpose of having it cleaned; and that whatever transfer it might be under the necessity of or desirous of making to other carriers in order to complete the transit should be made at that point.   But nothing in these bills of lading, including the notations made thereon in reference to the elevator at Council Bluffs, authorizes or will sustain a construction that by the bills of lading the Railway Company agreed to transport this freight only to Council Bluffs or to make delivery of it there.

2. In the case at bar the Railway Company, the carrier, delivered the freight to the consignee named in the bills of lading without such bills of lading having been first surrendered to it.   We are not necessarily concerned with the question whether a carrier may with impunity deliver goods to the consignee named in the bill of lading at the place of destination mentioned in such bill of lading without its surrender, the carrier having no knowledge at the time that such bill of lading has been assigned or transferred.   The precise question in this case is whether the Railway Com-

pany, having no knowledge that these bills of lading had
been transferred to Bacon & Co., was justified in delivering
the grain to the consignee named in the bill of lading at a
point intermediate the place of shipment and the place of
destination.

In *Gates v. Chicago, B. & Q. R. Co.*, 42 Neb., 379, it
was held: "The bill of lading issued by a carrier to the
owner or shipper is the symbol of ownership of the goods
shipped, and though not negotiable is assignable." (See, also,
*Furman v. Union P. R. Co.*, 106 N. Y., 579, 13 N. E.
Rep., 587.)

In *Pennsylvania R. Co. v. Stern*, 119 Pa. St., 24, 35
Am. & Eng. R. Cases, 551, it was held: "Bills of lading
are symbols of property, and when properly indorsed
operate as a delivery of the property itself, investing the
indorsers with a constructive custody which serves all the
purposes of an actual possession, and so continues until
there is a valid and complete delivery of the property, under
and in pursuance of the bill of lading, and to the persons
entitled to receive the same." (See, also, Hutchinson, Car-
riers, sec. 129; *Forbes v. Boston & L. R. Co.*, 133 Mass.,
154; *The Thames*, 81 U. S., 98.   See, also, *Walker v. De-
troit, G. H. & M. R. Co.*, 9 Am. & Eng. R. Cases [Mich.],
251.)  In this case a creditor of the consignee attempted
to get possession of the property by garnishment proceed-
ings against the carrier.   The supreme court of Michigan,
however, discharged the carrier from liability on the gar-
nishment proceedings, and held: "Common carriers must
recognize transfers of bills of lading and consignments of
goods, and unless protected by proper vouchers cannot al-
ways assume to deal with consignments as actually and
beneficially belonging to the consignee."

In *McEntee v. New Jersey Steamboat Co.*, 45 N. Y.,
34, it was held: "Common carriers deliver property at
their peril, and must take care that it is delivered to the
right person, for if the delivery be to the wrong person,

either by an innocent person or through fraud of others, they will be responsible, and the wrongful delivery will be treated as a conversion."

In Hutchinson, Carriers, sec. 130, it is said: "The carrier takes the risk of a delivery to the person entitled to the goods by the bill of lading and its indorsements. * * * Too great caution cannot, therefore, be exercised in respect to the right of the person to whom the delivery is made. No obligation of the carrier is more rigorously enforced than that which requires delivery to the proper person, and the law will allow in fact of no excuse for a wrong delivery except the fault of the shipper himself." (See, also, Hutchinson, Carriers, secs. 340, 344.)

In *Pennsylvania R. Co. v. Stern*, 35 Am. & Eng. R. Cases [Pa.], 551, it is said: "A railroad company has no right to make a delivery of freight otherwise than in strict accordance with the bill of lading."

In *Gates v. Chicago, B. & Q. R. Co.*, 42 Neb., 379, it was held: "The delivery of goods by a common carrier to the consignee thereof is made at the peril of the carrier, unless when made the consignee surrenders the bill of lading either made or indorsed to himself." (See, also, *Louisville & N. R. Co. v. Barkhouse*, 13 So. Rep. [Ala.], 534; *Weyand v. Atchison, T. &. S. F. R. Co.*, 75 Ia., 580.)

In the light of these authorites we conclude: (1) That the Railway Company, by its bills of lading, contracted to transport the freight to Milwaukee and St. Louis and there deliver it to the consignee named in the bills of lading, namely, Brown Bros. Grain Company, or if the bills of lading had been transferred by them, then to the lawful holders of said bills; (2) that Bacon & Co., by honoring the drafts drawn against them by Brown Bros. Grain Company, with said bills of lading attached thereto and assigned to them, became and were entitled to have said grain delivered to them at Milwaukee and St. Louis; (3) that the Railway Company, by delivering said grain to the

9

consignees mentioned in said bills of lading, at a station intermediate the point of shipping and the point of destination, and without the surrender of the bills of lading, was guilty of a misdelivery and conversion of said grain.

3. It is suggested in argument here by the counsel for the Railway Company that it ought not to be held liable to Bacon & Co. for so much of the grain as was delivered to Brown Bros. Grain Company before they indorsed to Bacon & Co. the bills of lading for such grain. This position we think is untenable. In the first place the Railway Company, having issued these bills of lading, would be estopped as against the assignee and holder thereof for value from saying that it had never had such grain in its possession. (*Sioux City & P. R. Co. v. First Nat. Bank of Fremont*, 10 Neb., 556.) And the Railway Company, having received this grain and undertaken its transportation, by delivering it while in transit to the consignee named in the bill of lading and without the surrender of such bills of lading at the time put it in the power of Brown Bros. Grain Company to defraud third parties by selling the grain and indorsing the bills of lading. And the Railway Company is also liable for this grain on the familiar principle that where one of two innocent parties must suffer, he who by his conduct has enabled a wrong-doer to perpetrate a wrong must bear the loss rather than the party without fault. (*Walters v. Western & A. R. Co.*, 56 Fed. Rep., 369.) It was the duty of the Railway Company, the carrier, before delivering this grain to any person at any place, to take up the outstanding bills of lading which it had issued for it. So long as the bills of lading were outstanding they were representations by the Railway Company to the commercial world that it had in its possession and under its control and in transit to Milwaukee and St. Louis the grain for which the bills of lading called.

There is no error in the record, and the judgment of the district court is

AFFIRMED.